## J. M. Simmons *et al. v.* M. M. Holmes, Supt. Education, Holmes County.

1. School Fund—Sixteenth Section School Lands.—The right of the State to manage the township lands and funds by the agencies prescribed by the Legislature, is not now an open question in this State. This right has been exercised ever since the organization of the State government. County Superintendents of Education, under our Constitution and the laws of 1870, are the legitimate successors of the Presidents of the Boards of Trustees of the superceded systems, and have the right to sue for and recover moneys due to said Trustees for the purchase of lands sold by them; and in the case at bar, the question of distribution or diversion is not involved.

2. Same—Case in Judgment.—Where R., as President of the Board of Trustees of the sixteenth section fund, sold a section of land, in 1862, to S. & S., for $4911.14, and took their notes for the purchase money. *Held:* That the County Superintendent of Education of the county, as successor, has the right to sue and enforce the vendor's lien for the purchase money.

3. SAME—EQUITY JURISDICTION.—The true basis of equity jurisdiction in this class of cases, rest in the right of a creditor to follow assets of a testator into the hands of distributees, who have received property from an executor, by distribution, under a will, prior to the discharge of all the debts against the estate. 2 Story Eq. Jur., § 1251. Equity jurisdiction is ample, independent of the question of vendor's lien. Jurisdiction being established, the right to protect and preserve property by injunction follows as a part of the remedial power of chancery, and this protective power is equally inherent, upon whatever grounds jurisdiction is obtained.

Appeal from the chancery court of Holmes county. Hon. J. J. HOOKER, Chancellor.

Complainant's bill seeks recovery on a writing obligatory of $4911.14, which, he charges, was executed by J. S. Simmons and L. B. Simmons, payable to Elijah Russell, President of the Board of Trustees for the purchase money of a certain sixteenth section, sold to them, and due the 18th of January, 1863; that complainant is County Superintendent of Education of Holmes county; both obligors are dead; S. B. Simmons died testate, and J. M. Simmons is his executor, without surety; S. B. Simmons, at his death, held a note on C. S. Skidmore, for $41,600.00, secured by vendor's lien on land; that J. M. Simmons, executor, filed his bill in the chancery court, obtained decree, and sold said land, and conveyed the same to those who, by the will of S. B. Simmons, were his legatees, for $5000.00; afterwards, in March, 1869, a bill was filed to sell the said land, for division among the legatees, and J. M. Stegler was appointed commissioner to sell the same, which sale was about to be executed; and the complainant, fearing it might result in the loss of his debt against the estate of Simmons, prayed an injunction; that J. M. Simmons was successor to Elijah Russell, as trustee, etc., and charges collusion and fraud. The legatees are asked to be made parties, and that the matters be held in *statu quo.* Injunction was allowed and issued.

The answer denies the execution of the writing obligatory by S. B. Simmons; admits the execution by J. S. Simmons; the probate of the will of S. B. Simmons; grant of letters testamentary, without surety; the filing of bill on the note

of Skidmore; the decree and sale of the land; the purchase and conveyance to the legatees of S. B. Simmons, and afterward the filing the bill for sale of same for division; decree and proceedings to sell. Denies the fraud and collusion, and every suggestion of a purpose to defeat creditors, but says that the purchase of the land under the decree to enforce the vendor's lien against Skidmore was to prevent it being sacrificed to strangers, the decree being for upwards of $50,000.00, and the land being the only security; that the legatees agreed to purchase the land and pay any debts that might be established against the estate, and that this was all done in good faith, and with no purpose to defraud, and that subsequently, when it was thought that the land would sell for a fair price, a bill was filed and decree obtained to sell for division in which no fraud existed. The insolvency of J. M. Simmons and the legatees is denied; admits that no account of his executorship was rendered, but says that course was acceptable to those interested, and that the debts were all paid. Admits that the writing obligatory was probated against the estate of J. S. Simmons, but denies that it was probated and registered against the estate of S. B. Simmons, and claims that it was barred by the statute of limitations, for non-presentation. The answer claims that legal title to the land is in the legatees, and that they have the right to a sale for division. The answer is made a cross bill, as to the averment that $1642.19 had been paid by the estate of J. M. Simmons. The answer to the cross bill reaffirms the averment in the original bill as to the payment. A motion was made to dissolve the injunction on pleadings and evidence. The motion was denied and an appeal taken to this court, in accordance with the statute. Assigns the following errors:

That the said chancery court denied the motion to dissolve the injunction in said case, on the ground stated in said motion; continued said injunction. Wherefore the said appellants pray a reversal of said decree, and a decree here dissolving said injunction.

*J. A. P. Campbell,* for appellants :

The theory of the bill is that complainant, as holder of a legal demand against the estate of S. B. Simmons, deceased, is entitled to the aid of chancery to restrain the legatees of decedent from reducing to severalty their joint interest in lands purchased by them, under a decree in favor of the executor of the testator, and to have his legal demand paid by decree of a court of chancery, out of the proceeds of this land. Because the executor of S. B. Simmons, in the discharge of his duty, obtained a decree to enforce a vendor's lien on land bought by Skidmore from Simmons, and the beneficiaries under the will of Simmons, instead of allowing the lands to be sold for a trifle, under the decree, themselves become the purchasers, and subsequently were proceeding to have the land sold for division.

The holder of a purely legal demand cannot obtain the aid of chancery to reach equitable assets, until he has exhausted his legal remedies. Farned v. Harris, 11 S. & M., 366; Brown v Bank, of Miss., 31 Miss., 458; Scott v. McFarland, 34 Miss., 363; Vassar v. Henderson, 40 Miss., 519; Parish & Co., v Lewis & Co., 1 Freem. Ch. R., 299; Pleasants v. Glasscock, 1 S. & M., Ch. R., 17; Freemam v. Finall, 1 S. & M., Ch. R., 623.

Manifestly the claim of complainant is purely legal, and if he can recover on it in chancery, any holder of a claim by note or open account, *ex contractu* or *ex delicto,* may proceed by bill in chancery. Undoubtedly the legal title to the land sought to be reached by this bill, is in the legatees of Simmons, who purchased it under decree against the estate of Skidmore, and the idea on which it is sought to be reached and made liable to this demand, is, that it was paid for with the decree in favor of the estate of Simmons, it is to be treated in equity as part of the estate of Simmons, and, therefore, liable in equity as assets for his debts. Is this not plainly an effort by a general creditor, without a judgment even, to reach equitable assets by the decree of a court of chancery, on a purely legal demand? Grant that the land

is liable for the debts of S. B. Simmons, can it be reached and subjected in this proceeding? It is unprecedented for chancery to stay the hand of an owner, and restrain him from disposing of his own, at the instance of a general creditor, until such creditor can obtain his judgment at law. 1 S. & M., Ch. R., 623; Wiggins v. Armstrong, 2 John., Ch. Rep., 144–283; Brinkerhoff v. Brown, 2 John., Ch. R., 671.

It is obvious that this is just what is sought by this bill, for the pleader in preparing the bill was impressed with the idea that he must resort to a court of law to enforce this legal demand, and apologetically states in the bill why suit at law had not been instituted, and avers his purpose to sue at the next term of the circuit court. Meanwhile this bill was brought to hold matters *in statu quo*, until judgment at law should be obtained.

No authority for it can be found under our system, not even under the chancery law of 1870, for this court has held that the 34th section of that act does not entitle a creditor of a deceased person to file his bill in chancery, to force a demand. J. Bernheimer, *et al* v. J. C. Calhoun, Opinion Book "A," p. 449. If the chancery court could maintain such a bill, and grant relief for such a demand, the motion to dissolve this injunction would exist solely on the principle *quia timet*, and there the answer implicitly denied the charge of fraud, collusion and confederation, and dissipated all fears, by showing them groundless and exhibiting the action and motives of defendants as entirely legitimate and proper, in reference to the land sought to be affected by the decree prayed. The answer responds to the bill, as to the alleged grounds of apprehension, and denies them, and there is no evidence as to this, the bill is therefore overthrown. The fact that the executor did not give security is no ground for relief, nor for a restraint of the co-defendants in proceeding to sell the land for division. The proceeding for security is provided for by art. 54, p. 436, Rev. Code of 1857, and this bill does not come within that, but if it did, and was good as against the executor, the

injunction is not therefore maintainable against the legatees, owners of the land by their purchase. Nor is the admitted fact that the executor did not render account to the court, a ground for this bill. The remedy for that is in art. 104–5, pp. 450–1, Rev. Code, 1857; and if this bill be sufficient as against the executor for that, it is not therefore maintainable as a bill to enjoin the other defendants from their lawful proceeding to sell their land and divide the proceeds.

But a graver question still arises, viz: Can the county superintendent of education maintain this suit on a bill single, payable to the president of the board of trustees of a township, for the lease of the sixteenth section? By section 2, of an act to be found on page 165, acts of 1870, he is authorized, by and with the consent of " the board of school directors of his county to sue," etc.

The consent of the board of school directors is a prerequisite, and that must appear affirmatively. It does not appear in this case. It is not averred, and, as complainant without that, has no right to sue on such claim as is here involved, the suit, as it is brought, is not maintainable. But can the county superintendent, by and with the consent of said board, " sue on such demand?" So the act above cited reads, but is it valid? I affirm the negative. By the 12th section of the act of Congress, of 1803, March 3d, found on p. 652, Revised Code 1857, " section sixteen," in each township of thirty-six sections in this State, was reserved from sale, for the support of schools within the same. It was not granted to Mississippi, but merely reserved from sale, and the title remained in the United States. It is true the legislature of this State acted on the idea of the title to the 16th sections being in the State, and provided for their disposal. Hester v. Crisler, 36 Miss., 681.

By act of Congress, approved May 19, 1852, on page 696, Revised Code 1857, the action of our legislature in disposing of 16th sections was ratified, and power conferred to lease any not disposed of; provided, the consent of the institutions of the townships should be obtained; and, " Provided further,

that in all cases, the money arising from the sale of lands within a particular township and district, shall be appropriated to the use of schools within that township and district." The preceding part of the act is alike explicit in declaring that the money arising from a " 16th section should be invested for the use and support of schools within the several townships and districts of the county for which they were originally reserved and set apart, and for no other use or purpose whatever."

The act of 1803 merely reserved the 16th section of each township from sale. The act of 1852 granted the 16th section of each township in the State for the inhabitants of the township of which it was a part. The object was the support of schools in each township, and the conditions of the grant were, that the 16th section should not be disposed of without the consent of the inhabitants of that township, and that the money arising from the disposal of it should be sacredly applied to the support of schools in that township, and for no other purpose. This was the condition annexed to the grant by Congress. It is a right vested in the inhabitants of each township by grant from Congress, and it cannot be divested. Fletcher v. Peck, 6 Cranch Rep. 87 ; Grenada Academy v. Morton, 8 S. & M. 785 ; State of Indiana v. Springfield township, 6 Ind. R. 83 ; State v. Newton, 5 Blackford 455 ; Bishop. v. McDonald, 27 Miss. R. 371 ; Trustees Vincennes University v. Indiana, 14 How. U. S. 268.

The act of Congress granting 16th sections was the supreme law of the land. The act of 1870 disregards the conditions contained in the two provisos of the act of Congress of May 19, 1852, and to that extent are nugatory. 8 S. & M. 785. It is made the duty of the county superintendent to pay over to the county treasurer, who is to pay over to the State treasurer, and the Congressional township fund is to be lost in the " common school fund " of the State, which is to be annually apportioned by the Auditor in utter disregard of the vested rights of the inhabitants of each particular township. It is true that art. VIII, sec. 6, of our present con-

stitution contemplates this.     But it is not in the power of
the people by a constitution to impair the vested rights se-
cured by grant of Congress.     No act of Congress could re-
voke the grant of the 16th section, nor modify the conditions
annexed, and no approval by Congress of the constitution of
Mississippi could affect thus indirectly, what it could not do
directly.     Nor can it be urged that Congress designed to
approve such diversion of the fund.

To allow the money arising from the 16th section of each
township, to be collected by the county superintendent of
education, is to allow its diversion from the purpose to which
it was devoted by the terms of the grant by Congress.     For
the superintendent is an official agent in a system that ig-
nores all township lines, and disregards the vested rights of
the inhabitants of each particular township to have their
school, supported by this fund.     It is only by defeating a re-
covery by the county superintendent of education, that the
rights of the inhabitants of the townships to this fund can
be conserved, as secured by the act of Congress granting the
sixteenth section.     If he shall recover, he has to pay over to
the county treasurer, who, in turn, must pay over to the
State treasurer, and the inhabitants of each township will be
without means of legal redress, or by the provisions of § 2055
Revised Code 1871, the board of directors (county) may in-
vest it in the bonds of the State of Mississippi.     Upon the
plausible distinction urged, that the right to sue and collect,
and the dispositions to be made of the funds afterward de-
volved upon the county superintendent.     See the concluding
part of the opinion of the court.     Coulter *et als.* v. Robert-
son, 24 Miss., 341, 342.

Why permit the county superintendent to recover if he
may be enjoined by the township.     The school law of 1870,
and §§ 2054-5, Code of 1871, and kindred sections, are in con-
flict with art. VIII, sec. 6, of our constitution, sec. 6, declares
that the common school fund " shall embrace the " fund aris-
ing from the consolidation of the congressional township fund ;
" and sec. 3 creates a board of education for the management
and investment of the school fund ;" and the acts of the legisla-

ture conferring on the board of county school directors, and the county superintendents, management and investment of the school fund are unconstitutional.    Sec. 2055 authorizes investment of township money arising from 16th sections, in bonds of the State of Mississippi.    While sec. 6, art. VIII, of the constitution requires investment in bonds of the United States.

*R. S. Hudson*, on the same side filed an elaborate brief.

*Garnett Andrews*, for appellee :

Filed a very elaborate printed brief, from which the reporters take merely the authorities cited : Ham. v. The State, 18 How., 128; Wright v. The State, 8 Blackf., 65.

In construing statutes the court will uphold the act in doubtful cases.    Fletcher v. Peck, 6 Cranch, 87 ; Calder v. Bull, 4 Dallas, 386 ; Dartmouth Col. v. Woodward, 4 Wheat, 518 ; Stewart v. Supervisors, 27 Iowa, fully reported in 1 American Rep., 241; Newsom v. Cocke, 44 Miss., 352.

There is no conflict between our State constitution and the act of Congress granting the sixteenth section within the townships, respectively.    Act of Congress 1803, § 12, and act of Congress 1852, § 1 ; Code of 1857, pp. 652–696.

For a long series of years past, the legislature has consolidated many of the township funds; for instance :    Act of 1839, H. C. pp. 219–20; acts of 1848, Hutch. 236, art. 40; ib., p. 243, § 20; acts of 1839, p. 260; act of 1848, pp. 235–236; Pam. acts 1870, p. 15 ; Code, § 20–25.

These funds required to be invested in United States bonds, while safer, are clearly as completely within the statute as was the former investment in stock of the Planters' Bank of Mississippi; acts of 1833, Hutch., 214, §§ 2, 4 and 5.    Or as loaning it to individuals; act of 1836, Hutch., p. 218, § 4.    Or as lending it to a county ; Pam., act 1839, p. 260.

These defendants do not appear to have any interest in this fund, as beneficiaries under the law, and cannot com-

plain. Girard v. Philadelphia, 7 Wallace, 14; Armstead v. Ricks, MSS. Opinion.

It can hardly be seriously asserted, that the authority conferred upon the County Superintendents of Education, to sue for and collect these sixteenth section debts, is null and void. Pam. act 1870, pp. 165–166; Code of 1871, § 2055.

In some States, as Ohio and Indiana, they are granted to the *inhabitants of the township*, for the use of schools. Acts of 1802, 2 stat. at large, § 7; Brightly's Digest, pp. 707, 416.

In others, as Michigan and Iowa, to the States absolutely, for the use of schools generally, not confining them to townships. Brightly's Dig., 443, 615.

In Kansas, they are simply reserved for school purposes. Lester's land laws, 1 vol., pp. 224, 408.

But by far the most usual method has been to grant them to the States for the use of schools in the township, thus resting the legal title in the State, in trust, for the purpose mentioned, as in Arkansas, California, Florida, Illinois, Missouri, Oregon, etc. 5 Stat. at large, 58; 3 ib., 428, 545; 11 ib., 383; Lesly's Land Leases, 207. And this was the case in Mississippi, under the act of Congress of 1803.

The courts hold the state to be a trustee for the benefit of township inhabitants, and had a right to sell the sixteenth sections, even without authority of Congress, devoting the proceeds to the object of the grant. Maupin v. Parker, 3 Mo. R., (2 ed.) 219; State v. Dent, 18 Mo. R., 313; Butler v. Chariton co. ct., 13 ib., 112; Dennis v. Maynard, 15 Ill., 477; Greenleaf v. Township Trustees, 22 Ill., 236; School Directors v. Shool Directors, 36 Ill., 140; Long v. Brown, 4 Ala., (new series) 631.

In California it is held, that an act consolidating this fund for general school purposes is valid. Winan v. Bavard, 22 Cal., 524; Windham v. Chisholm, 35 Miss., 532; Hester v. Crisler, 36 Miss., 681.

*H. S. Allen*, on the same side, filed an elaborate brief.

TARBELL, J., delivered the opinion of the court:

The real question, as is supposed, upon which a writ of error was prosecuted, in this case, arises upon the right of a County Superintendent of Education, under our present school system, to enforce collection of a note given for the purchase of a " sixteenth section," and made payable to the President of a Board of Trustees under a former mode of conducting our educational affairs.

It is contended by counsel, that the " sixteenth section," and the funds arising therefrom, are vested in the townships, and cannot be diverted without a violation of constitutional guarantees, and hence, it is urged, that the *collection* of the debts of the character of that presented herein, involves the *diversion* of the funds, thence arising, from townships.

The right of the State, to manage these township lands and funds, by the agencies prescribed by the legislature, is not now an open question in Mississippi.

This right has been exercised ever since the organization of the State government.   Acts, 1818, 1824, 1833, 1839, 1842, 1846, 1848.   Hutch., 210, 213, 222, 230, 238, 243, 248, 260; Const. of Miss., of 1817, Art. 6, Sec. 20 ; Laws of Congress, 1852; Sec. 1, in Code of 1857, Appendix ; Acts of 1870.

An inspection of these statutes exhibits, numerous changes in these agencies, and a very great diversity of what may be not improperly denominated, experiments, as, at first, this management was confided to the justice of the county courts ; then to township trustees ; afterwards, to board of police, in certain cases ; from the latter, it was changed to probate judges, in some instances.   In 1846, there were county commissioners, and in 1848, this control was given to county superintendents and trustees, in some of the larger counties, including the county of Holmes.   And now, under our present constitution and legislation, we have a system, with officials, differing in some respects, from all prior methods.

These repeated changes are given only to show that the

State has, from the outset, in 1818, exercised the right to designate the agents for the care of this national donation. And this right, it is believed, has never been questioned. In Morton v. Grenada Academy, (8 S. & M., 773,) the right of the legislature, by special legislation, to substitute another set of trustees in place of those appointed under the general law, was left undecided, while the general right of control by the State was affirmed.

However, the argument of counsel for the appellants, is, not that this general control is not in the State, but that, under the law of 1870, collection involves distribution and diversion, which, it is insisted, ought to be decided now.

It is not conceded that this position is tenable. The parties made defendants by the bill of the superintendent, are not residents of the particular townships interested, nor are the inhabitants of that township interposing their claim to this money. We are of the opinion, therefore, that the question of distribution or diversion is not involved in this issue. Whether, by the acts of Congress, title to the sixteenth sections, passed to the townships or to the State, or, whether the townships have vested rights in these lands and their proceeds, should be presented in a direct proceeding for that purpose, by the proper parties. In the present proceeding, it is sufficient to pass upon the right of the county superintendent to collect the debt in controversy. For this purpose, we hold the county superintendents, under the constitution and laws of 1870, to be the legitimate successors of the presidents of the boards of trustees of the superceeded systems.

The minor questions in the case are presented by the demurrer to the bill; want of equity; remedy at law and not in equity; no jurisdiction in equity; and the bar of the statute of limitations. The demurrer was followed by a motion to dissolve the injunction granted upon the bill, which motion was denied; thereupon the demurrer was overruled, and the defendants filed their answer. This leads to an analysis of the facts presented by the record.

The complainant in the original bill is County Superintendent of Public Education of the county of Holmes. In 1862, Jas. S. Simmons and S. B. Simmons gave their joint and several notes for the sum of $4911.14, payable to Elijah Russell, President of the Board of Trustees of section 16, township 14, range 2, west, or his successor in office, for the purchase of the lands described in the note. These, or certain other lands, which are not clearly defined in the bill, were sold to one Skidmore, for a large sum, by Simmons, who retained a vendor's lien. Subsequently, Skidmore and Jas. S. and S. B. Simmons died. S. B. Simmons left a will, wherein he named Isaiah M. Simmons the executor of his estate. The latter proceeded, in chancery, to enforce the vendor's lien of his testator upon the lands sold by him to Skidmore. This proceeding resulted in a sale of the lands to the heirs, legatees and devisees of S. B. Simmons, deceased, by arrangement between them and the executor, who conducted both the sale and the purchase, the heirs, etc., taking an interest in the purchase in proportion to their rights under the will. Thereupon, these parties, as cotenants, instituted an action to sell these lands for division. Pending this last proceeding, the complainant, Holmes, as superintendent, etc., filed his bill of complaint against Isaiah M. Simmons, executor, etc., and against the heirs, etc., of S. B. Simmons, deceased, some of whom are minors, to enjoin the sale and division about to take place in the action above mentioned. He avers fraud and collusion between the executor and heirs, etc., to defeat the collection of the debt due the school fund, and states that the executor gave no security as such, and that he exacted no refunding bond of the heirs, devisees, etc., to whom he had made distribution; that the executor and heirs are insolvent; that the executor probated the claim in controversy against the insolvent estate of Jas. S. Simmons, deceased, but did not probate it against the solvent estate of S. B. Simmons, deceased; that Isaiah M. Simmons, the executor named, succeeded Russell as president of the board of trustees, and had in his

actual possession, while serving in both capacities of executor and of trustee, etc., the claim in controversy; that the executor is the son-in-law of S. B. Simmons, deceased; that no other property of the estate of the latter remains, out of which to make this debt, save the lands mentioned as about to be sold for division, and involved in this controversy; and, which is material and important, that all other debts against the estate, save the one in controversy, have been paid.

The bill prays for an injunction to enjoin the sale of the lands for division; that the executor account; for discovery; for payment, or sale of the lands involved to that end; and for such other relief, etc.

The answer sets up the plea of *non est factum* as to the signature of S. B. Simmons, deceased, and this plea is sworn to by Isaiah M. Simmons, one of the defendants, and executor, etc. Possession of the note while both executor, etc., and president of the board of trustees, is denied by the defendant, Isaiah M. Simmons. The answer admits some of the heirs, etc., to whom distribution had been made, to be insolvent, and that no refunding bond had been required of any of them, and that the executor had rendered no account because none had been asked of him by those interested, they having confidence in him without accounting. Fraud and collusion are denied, and the answer is made a cross bill, with prayer for discovery.

The answer of the superintendent to the cross-bill, repeats the averments of the bill, and adds, that the records of the board of trustees are in the hands of the executor, and that such records are supposed to contain matters important to this issue.

Testimony was taken emphatically overthrowing the plea of *non est factum*, and it would seem that the executor must have known the signature of his testator to have been genuine when he made that defense. And a receipt of Isaiah M. Simmons was presented in evidence, showing him

in the actual possession of the note, in 1866, when, if the facts are correctly understood, he was both executor, etc., and president of the school board.  Other testimony was taken, pertinent to the issues, not necessary to be stated here.

Upon the pleadings, exhibits and testimony, another motion to dissolve the injunction was made, which motion was overruled, and thereupon an appeal was taken to this court. Here a single error is assigned, based upon the action of the Chancellor in refusing to dissolve the injunction.  Upon the right of the Superintendent of Education to enforce the payment of the debt in litigation herein, and of the rights of the township to the funds arising therefrom, the arguments of counsel have been most exhaustive, but nothing need be added to what has already been said on this point.

As to the bar of the statute of limitations, the facts presented in the record justify the action of the Chancellor in refusing to dissolve the injunction on this ground, (Perry v. West, 40 Miss., 233; 1 How., 215; 3 ib., 216, 301; 4 ib., 242; 5 S. & M., 651; 2 ib., 453; 3 ib., 473; 8 ib., 552; 37 Miss., 110; 27 ib., 643) whether by reason of knowledge of the existence of the claim through its possession by the executor, or, upon the theory that it was fraudulently withheld from registration by him.

With reference to the remaining propositions, upon which is propounded the question of equity jurisdiction, it is contended that the case at bar falls within the general rule; that equity will not, in the first instance, take jurisdiction of a purely legal claim, and that, in such a case, judgment must be had, with execution and a return of *nulla bona* before chancery will interfere in aid of the creditor; or, in other words, that in the enforcement of a purely legal claim, the debtor must be prosecuted to insolvency before the creditor can resort to a court of equity to enforce his claim.  The class of cases referred to are familiar and unquestioned, but it is believed the jurisdiction of chancery

over the case presented, ought to be sustained on one or all of the following grounds:

It is not clear, from the bill, whether this is a proceeding to enforce the vendor's lien. If it is, the jurisdiction of equity will, of course, be conceded. Nevertheless, the authorities on this subject are appended: 2 Story, Eq. Jur., § 1217; id., § 789; Payne v. Harrell, 40 Miss., 498; 1 Vern., 399; 3 Atk., 200; 9. John. Ch. R., 145; 11 S. &. M., 366; 31 Miss., 458; 34 id., 363; 40 ib., 519; 1 Tru. Ch., 299; 1 S. & M. Ch., 17, 623; 4 John. Ch., 671; 2 S. & M., 697; 5 ib., 662; 6 John. Ch., 77; 2 Story Eq. Jur., § 1217; ib., 960, 905, 908, 953, 954, 406, 959; Code of 1871, §§ 974, 979.

The true basis of equity jurisdiction in this case, probably, rests in the right of a creditor to follow assets of a testator into the hands of distributees who have received property from an executor by distribution under a will, prior to the discharge of all the debts against the estate. 2 Story Eq. Jur., § 1251. Or, in the case at bar, treating the defendants as purchasers purely, equity jurisdiction may, perhaps, be predicated upon the theory, as charged in the bill, that they were colluding with the executor to defeat the claim and its enforcement. Ib., §§ 1257, 1258. For further grounds, see ib., §§ 90, 91, 92. Equity jurisdiction is ample, independent of the question of vendor's lien, referred to only because the bill is not clearly understood. Jurisdiction being established, the right to protect and preserve property by injunction follows as a part of the remedial power of chancery, and this protective power is equally inherent, upon whatever ground jurisdiction is obtained. *Vide* authorities above cited.

Upon the record as now interpreted, the Chancellor was proceeding according to the principles of equity and justice.

The decree refusing to dissolve the injunction is affirmed, and the cause remanded for further proceedings.